IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENELOPE KONTOULIS, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | NO. 18-3864 |
| ENCLARA PHARMACIA, INC., et al., | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

In this action, Plaintiff Penelope Kontoulis ("Kontoulis" or "Plaintiff") asserts claims against her former employer, Defendant Enclara Pharmacia, Inc. ("Enclara") and supervisor, Diane Perrymore ("Perrymore") (collectively, "Defendants"), for discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (Counts I and II) and for interference and retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654 (Counts III and IV).  Before this Court is Defendants' Motion for Summary Judgment which seeks the dismissal of all claims asserted by Kontoulis.[1] For the reasons discussed below, the Motion will be granted.

## I.   FACTUAL BAKGROUND

The undisputed facts of record confirm that Kontoulis was employed by Enclara as its Payroll Manager from May 31, 2016 through August 9, 2017, when she was terminated.  Defs.'

---

[1]   Upon consent of the parties and by order of the Honorable Mark A. Kearney, the case was referred to the undersigned to conduct all further proceedings, including trial, the entry of final judgment, and all post-trial proceedings.  Doc. No. 10.

Statement of Undisputed Material Facts (Doc. No. 37-2) ¶¶ 1, 16 [hereinafter "Defs.' Facts"];
Pl.'s Counter Statement to Defs.' Statement of Undisputed Material Facts (Doc. No. 38-4) ¶¶ 1,
16 [hereinafter "Pl.'s Facts"].  As Payroll Manager, Kontoulis was responsible for Enclara's
payroll process and payroll system, including responsibility over the input of data for payroll,
changes in employee status, updates in Automatic Data Processing ("ADP") for changes in
positions, and changes due to hiring and terminations.  Defs.' Facts ¶ 1; Pl.'s Facts ¶ 1.
Kontoulis reported directly to Perrymore, Vice President of Human Resources.  Defs.' Facts ¶ 3;
Pl.'s Facts ¶ 3.

### A.      Schedule Adjustments and FMLA Leave

Throughout her employment, Kontoulis requested various adjustments to her work
schedule, which she alleges were to care for her son who had Fragile X Syndrome and autism.
Defs.' Facts ¶ 6; Pl.'s Facts ¶ 6.  Kontoulis alleges that "she requested multiple accommodations
due to her son's disability."  Pl.'s Facts ¶ 8.

During the course of her employment, Kontoulis also had multiple instances where she
was either late for work or called out from work.  Defs.' Facts ¶¶ 9, 11; Pl.'s Facts ¶ 9.  From
approximately the end of 2016 through April 2017, Kontoulis was late to work multiple times,
called out from work at the last minute, or worked from home.  Defs.' Facts ¶¶ 9, 11; Pl.'s Facts
¶ 9.  In April 2017, Kontoulis and Perrymore discussed changing Kontoulis' work schedule so
that she would arrive to work and leave work earlier and be allowed to work from home on
Fridays.  Defs.' Facts ¶¶ 9-10; Pl.'s Facts ¶¶ 9-10.  Perrymore authorized this new schedule to
begin on May 1, 2017.  Defs.' Facts ¶¶ 9-10; Pl.'s Facts ¶¶ 9-10.  Notwithstanding this schedule
change, Kontoulis was documented late approximately 29 times in the three months following
the implementation of her new schedule.  Defs.' Facts ¶¶ 11, 20; Pl.'s Facts ¶¶ 11, 20.  Kontoulis

admitted that she was not adhering to her new schedule and that Perrymore had a discussion with her about her lateness.  Defs.' Facts ¶ 12; Pl.'s Facts ¶ 12.

On June 25, 2017, Kontoulis requested permission for late arrival to put her son on the bus for summer camp the next morning, and she sought to leave early every day for the following six weeks at 1:30 p.m. to assist picking her son up from summer camp.  Defs.' Facts ¶¶ 22-23; Pl.'s Facts ¶¶ 22-23.  Although Kontoulis' requested work schedule modification was denied, two days later Perrymore offered Kontoulis the ability to leave early two days during the week and flexibility with her schedule on Fridays, when Kontoulis would work from home, to assist with her son's pick-up.  Defs.' Facts ¶¶ 22-23; Pl.'s Facts ¶¶ 22-23.  Kontoulis refused Perrymore's offer.  Defs.' Facts ¶¶ 22-23; Pl.'s Facts ¶¶ 22-23.  Kontoulis claims that when she made her time-off request to Perrymore, Perrymore responded by stating that "I don't care if your son has a disability.  You have to figure it out.  It's not my problem.  You need to figure it out.  You need to find other accommodations for your son and maybe this job is not for you."  Defs.' Facts ¶ 24; Pl.'s Facts ¶ 24.  Kontoulis further claims that these comments were overheard by Allison Butler ("Butler"), Enclara's Benefits and Compensation Manager.  Defs.' Facts ¶¶ 4, 24; Pl.'s Facts ¶¶ 4, 24.  Perrymore denied making those statements and Butler denied overhearing any statement of this nature.  Defs.' Facts ¶ 24, Pl.'s Facts ¶ 24.

Shortly after Kontoulis requested time off in relation to her son's summer camp, Butler suggested that Kontoulis look into the possibility of applying for FMLA leave.  Defs.' Facts ¶ 26; Pl.'s Facts ¶ 26.  Butler provided Kontoulis with FMLA information and contact information for Enclara's third-party FMLA administrator, FMLA Source, and explained that Kontoulis might want to apply for intermittent FMLA leave for situations in the future where she needed to leave early if her son had medical issues or needed to go to doctor appointments.  Defs.' Facts ¶

26; Pl.'s Facts ¶ 26.  FMLA Source received Kontoulis' subsequent request for intermittent

FMLA leave on June 29, 2017.  Defs.' Facts ¶ 28; Pl.'s Facts ¶ 28.  Butler forwarded the

paperwork to Kontoulis with information regarding call-out procedures, scheduling

appointments, and paid time off.  Defs.' Facts ¶ 28; Pl.'s Facts ¶ 28.  Other than submitting

paperwork, Enclara was not involved in the processing of FMLA applications and FMLA Source

was solely involved in this process.  Defs.' Facts ¶ 28; Pl.'s Facts ¶ 28.  Kontoulis claims that

when she applied for FMLA leave, Butler informed her that she would not tell Perrymore about

the application because Perrymore would allegedly try to interfere with the process, although

Butler denied ever saying this.  Defs.' Facts ¶¶ 29-30; Pl.'s Facts ¶¶ 29-30.

On July 14, 2017, Kontoulis was notified that FMLA intermittent leave had been

approved from June 29, 2017 through June 28, 2018.  Defs.' Facts ¶ 32; Pl.'s Facts ¶ 32.  On the

same day, Butler notified Perrymore that Kontoulis had applied for intermittent FMLA leave to

care for her son.  Defs.' Facts ¶ 32; Pl.'s Facts ¶ 32.  Perrymore responded with "Thanks – let me

know the duration and time periods."  Defs.' Facts ¶ 32; Pl.'s Facts ¶ 32.

Prior to her termination, Kontoulis only used one day of FMLA leave when she reported

eight hours of leave on August 2, 2017 to FMLA Source, which was approved.  Defs.' Facts ¶

34; Pl.'s Facts ¶ 34.   This was the only time that Kontoulis applied for and used FMLA leave.

Defs. Facts ¶ 34; Pl.'s Facts ¶ 34.  Kontoulis claims that when she took this FMLA leave,

Perrymore allegedly asked for proof to support the leave, although Perrymore and Butler deny

this ever occurred.  Defs.' Facts ¶ 35; Pl.'s Facts ¶ 35.  She also alleges, and Defendants deny,

that Perrymore made a series of disparaging comments about Kontoulis' use of FMLA leave.

See, e.g., Pl.'s Facts ¶ 35.  For example, Kontoulis maintains that she overheard Perrymore say

to Butler: "why would you allow her to request FMLA;" and "[i]f [Kontoulis] thinks she can take

4

FMLA because I denied her flex schedule for camp she's sorely mistaken.  She's going to lose her job regardless of FMLA or not."  Id. at ¶¶ 35, 67.

**B.**   **Kontoulis' Misconduct**

During July and August 2017, prior to her termination, Defendants identified Kontoulis as responsible for at least two instances of misconduct.  One instance of misconduct involved a deleted email from Scott Baach ("Baach"), Enclara's General Counsel.  Specifically, on August 3, 2017, at 10:13 a.m., Baach sent an email to Kontoulis to follow up on a request he received from an outside attorney regarding a wage garnishment order that Baach had previously forwarded in another email to Kontoulis on May 5, 2017.  Defs.' Facts ¶ 46; Pl.'s Facts ¶ 46.  In the May email, Baach asked Kontoulis to process a garnishment for another Enclara employee.  Defs.' Facts ¶ 46; Pl.'s Facts ¶ 46.  Kontoulis responded to Baach's August 3, 2017 email at 11:55 a.m., stating that she faxed a response to the garnishment that morning.  Defs.' Facts ¶ 46; Pl.'s Facts ¶ 46.  She further stated that "[t]here are no records of liens being received for [the employee] as long as I have been in Payroll."  Defs.' Facts ¶ 46; Pl.'s Facts ¶ 46.  Baach responded at 12:01 p.m., indicating that his email records showed that Enclara was served with the garnishment back in May 2017.  Defs.' Facts ¶ 46; Pl.'s Facts ¶ 46.  At 12:12 p.m., Kontoulis responded to Baach that the only copy of the garnishment she had received was the one provided to her in August 2017.  Defs.' Facts ¶ 46; Pl.'s Facts ¶ 46.  However, at 12:08 p.m., Kontoulis deleted an email she had received from Baach on May 5, 2017, in which the garnishment was first forwarded to her.  Defs.' Facts ¶ 47; Pl.'s Facts ¶ 47.  Enclara's IT department documented the deletion of the email and forwarded the information to Perrymore.  Defs.' Facts ¶ 47; Pl.'s Facts ¶ 47.  Although Kontoulis initially denied deleting Baach's email, at her deposition she admitted that she did, in fact, delete it.  Defs.' Facts ¶¶ 48-49; Pl.'s Facts ¶¶ 48-49.

5

A second instance of misconduct identified by Defendants involved an unauthorized change of Kontoulis' pay grade in Enclara's ADP payroll system.  Specifically, on July 26, 2017, Kontoulis' pay grade was changed in the ADP system to one level higher than what was then approved.  Defs.' Facts ¶ 50; Pl.'s Facts ¶ 50.  This pay grade change was also back dated to April 14, 2017, September 12, 2016, and August 24, 2016 in the system.  Defs.' Facts ¶ 50; Pl.'s Facts ¶ 50.

In her role as the Director of Finance, Christina Altomare ("Altomare") would receive a payroll change report every payday showing all changes to pay and personnel information which occurred to each employee in each pay period.  Defs.' Facts ¶ 51; Pl.'s Facts ¶ 51.  Altomare was responsible for auditing these payroll change reports for any discrepancies.  Defs.' Facts ¶ 51; Pl.'s Facts ¶ 51.  Accordingly, on the morning of August 9, 2017, Altomare received a payroll change report documenting the July 26, 2017 change to Kontoulis' pay grade, which had been back dated for three separate dates.  Defs.' Facts ¶ 51; Pl.'s Facts ¶ 51.  Immediately upon receiving the report, Altomare went to Perrymore, Kontoulis' direct supervisor, who confirmed that she did not authorize a pay grade change for Kontoulis.  Defs.' Facts ¶ 51; Pl.'s Facts ¶ 51.

Although Enclara's IT department confirmed that these changes were made from Kontoulis' computer using her log-in name, Kontoulis avers that she "has maintained from the outset of this matter that she did not engage in any unauthorized system manipulation" and is "unaware of how the changes were made."  Defs.' Facts ¶ 52; Pl.'s Facts ¶¶ 50-52.

C.    **Termination**

Upon learning of the unauthorized pay grade change, Perrymore spoke with Baach. Defs.' Facts ¶ 53; Pl.'s Facts ¶ 53.  Based upon reports that these changes were made on

Kontoulis' computer and under her log-in name, Perrymore and Baach decided to terminate Kontoulis. Defs.' Facts ¶¶ 53, 62, 64; Pl.'s Facts ¶¶ 53, 62, 64.

Also on the morning of August 9, 2017, the same morning in which Altomare received the payroll change report and reported it to Perrymore, Kontoulis requested to meet and did meet with Paul Williams ("Williams"), Enclara's Human Resources Manager. Defs.' Facts ¶ 60; Pl.'s Facts ¶ 60. At this meeting, Kontoulis explained to Williams that she was concerned that her job was in jeopardy because of ongoing conflicts with Perrymore. Defs. Facts ¶ 60; Pl.'s Facts ¶ 60. Williams advised Kontoulis that she could reach out to Baach. Defs.' Facts ¶ 61; Pl.'s Facts ¶ 61. After his meeting with Kontoulis, Williams met with Perrymore to tell her about his meeting with Kontoulis. Defs.' Facts ¶ 62; Pl.'s Facts ¶ 62. Perrymore advised Williams, however, that the decision had already been made to terminate Kontoulis. Defs.' Facts ¶ 62; Pl.'s Facts ¶ 62. In particular, Perrymore advised Williams about the deleted email from Baach and the change in Kontoulis' salary grade in ADP. Defs.' Facts ¶ 62; Pl.'s Facts ¶ 62. Williams did not participate in the decision to terminate Kontoulis. Defs.' Facts ¶ 63; Pl.'s Facts ¶ 63.

It is undisputed that when Baach and Perrymore met with Altomare to discuss the changes to Kontoulis' pay grade in ADP and ultimately their decision to terminate her employment, they were unaware that she was meeting with Williams. Defs.' Facts ¶ 64; Pl.'s Facts ¶ 64. Indeed, the first time that Perrymore became aware of the meeting was when Williams told her about it, but by this time the decision to terminate Kontoulis had already been made. Defs.' Facts ¶ 64; Pl.'s Facts ¶ 64. Accordingly, Kontoulis was terminated on August 9, 2017. Defs.' Facts ¶ 16; Pl.'s Facts ¶ 16.

II.     **SUMMARY JUDGMENT STANDARD**

Under the well-established summary judgment standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Williams v. Wells Fargo Bank, No. 14-2345, 2015 WL 1573745, at *3 (E.D. Pa. Apr. 9, 2015) (quoting Wright v. Corning, 679 F.3d 101, 105 (3d Cir. 2012)).

> [T]he plain language of Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his or] her case with respect to which [he or] she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"By its very terms, this standard [that there be no genuine issue as to any material fact] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).  A material fact is one that "might affect the outcome of the suit under the governing law."  Id. at 248.

When ruling on a motion for summary judgment, the court shall consider facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.

8

Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir.
2006).  To prevail on summary judgment, however, "the non-moving party must present more
than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably
find for the [non-moving party].'"  Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013)
(quoting Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)); see also
Anderson, 477 U.S. at 252.

## III.  DISCUSSION

### A.  Defendants Are Entitled to Summary Judgment on Kontoulis' ADA Claims

#### 1.  Association Claim

Kontoulis argues that Defendants discriminated against her in violation of the ADA on
the basis of her association with her disabled son.  Pl.'s Compl. (Doc. No. 1) ¶ 54.  The ADA
prohibits employers from discriminating against "a qualified individual on the basis of
disability."  42 U.S.C. § 12112(a).  The protections of the ADA also extend to protect against
adverse employment actions because of a qualified individual's association with a disabled
individual.  Id. § 12112(b)(4).  Specifically, the ADA's "association provision" protects qualified
individuals from employment discrimination based on the "known disability of an individual
with whom the qualified individual is known to have a relationship or association."  Id.

ADA discrimination claims are subject to the three-step burden-shifting analysis
established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), which requires a
plaintiff to establish a prima face case of discrimination and show that the defendant's legitimate
nondiscriminatory reason for terminating him or her was pretextual.  Dodson v. Coatesville
Hospital Corp., 773 F. App'x 78, 83 (3d Cir. 2019).  To establish a prima facie case of
associational disability discrimination, the plaintiff must show that he or she: (1) was "qualified"

for the job at the time of the adverse employment action; (2) was subjected to an adverse employment action; (3) was known by his or her employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.  Id. at 83 n.8; see also Pollere v. USIG Pa., Inc., 136 F. Supp. 3d 680, 685 (E.D. Pa. Dec. 18, 2015) (citing Barthalow v. David H. Martin Excavating, Inc., No. 5-2593, 2007 WL 2207897, at *3 (M.D. Pa. July 30, 2007)).  In an association discrimination claim, the Third Circuit "has observed that the fourth element can be met, for example, where an adverse employment action was 'motivated by unfounded stereotypes or assumptions about the need to care for a disabled person;' the 'disabled relative's perceived health care costs to the company,' 'fear of an employee contracting or spreading a relative's disease,' or because the employee was perceived to be distracted by the relative's disability."  Dodson, 773 F. App'x at 83 n.8 (quoting Erdman v. Nationwide Ins. Co., 582 F.3d 500, 511 & n.7 (3d Cir. 2009)).  If a plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its decision.  McDonnell Douglas, 411 U.S. at 802.  If the defendant succeeds, the burden returns to the plaintiff to show that the employer's stated reason for termination was merely a pretext for intentional discrimination.  Id. at 804.

Applying these standards to Kontoulis' ADA association discrimination claim, Kontoulis fails to establish all the elements of a prima face case of discrimination because, even when viewing the record in the light most favorable to Kontoulis, there is no genuine issue of material fact that she was terminated under circumstances raising a reasonable inference that the disability of her son was a determining factor in Defendants' decision.  As an initial matter, Kontoulis'

claim that Defendants discriminated against her in violation of the ADA by not providing her sufficient accommodations for her to care for her disabled son fails to establish a prima facie case of ADA discrimination.  Kontoulis argues that the Defendants regularly failed to accommodate her requested accommodations regarding her disabled son.  See, e.g., Pl.'s Facts ¶ 18.  Importantly, although an employer is prohibited from discriminating against an employee as a result of his or her association with a disabled relative, "the association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative." Erdman, 582 F.3d at 510.  While refusing to make reasonable accommodations might constitute illegal discrimination against a disabled employee, 42 U.S.C. § 12112(b)(5), "the plain language of the ADA indicates that the accommodation requirement does not extend to relatives of the disabled." Erdman, 582 F.3d at 510 (citing 29 C.F.R. § 1630.8, Appendix).  "Under the association provision, there is a material distinction between firing an employee because of a relative's disability and firing an employee because of the need to take time off to care for the relative." Id.  An unlawful termination must be "motivated by the known disability of an individual with whom the employee associates, as opposed to actions occasioned by the association." Id.  To be unlawful, the termination must be motivated by the disability rather than a plaintiff's stated intention to miss work, "in other words, that [the plaintiff] would not have been fired if [he or she] had requested time off for a different reason." Id.

        In support of her claim, Kontoulis argues that Defendants' rejection of her request to take off early for six weeks for her son's summer camp was evidence of their discriminatory intent. See, e.g., Pl.'s Facts ¶¶  18, 23, 56.  Defendants, however, were not required under the ADA to accommodate her son's schedule. Erdman, 582 F.3d at 510.  Moreover, Defendants did offer Kontoulis accommodations with her schedule to enable greater flexibility.  Effective May 1,

2017, Defendants agreed to a schedule that adjusted Kontoulis' hours on Monday through Thursday and allowed her to work from home on Friday.  Defs.' Facts ¶¶ 9-10; Pl.'s Facts ¶¶ 9-10.  Kontoulis admits, however, that once Defendants agreed to change her start time and work schedule, she proceeded to arrive late to work 29 times in a two-month period.  Defs.' Facts ¶¶ 11, 20; Pl.'s Facts ¶¶ 11, 20.  In addition, although Defendants denied Kontoulis' request to leave early every day for a six-week period to pick her son up from summer camp, Perrymore did offer Kontoulis the ability to leave early two days a week and have flexibility on Fridays.  Defs.' Facts ¶¶ 22-23; Pl.'s Facts ¶¶ 22-23.  Nevertheless, Kontoulis argues that this proposed compromise was evidence of Defendants' discriminatory intent because it "did not solve the problem."  Pl.'s Facts ¶¶ 18, 56.  Kontoulis' dissatisfaction with this offer because it was allegedly insufficient to care for her son  does not provide support for her claim that Defendants' proposed compromise was "highly discriminatory."  Id. ¶ 22.  Defendants were not required to accommodate her son's schedule, and the fact that they did offer her proposed accommodations is not evidence of discriminatory intent simply because it purportedly "did not solve the problem."  Pl.'s Facts ¶¶ 18, 56.  Kontoulis' dissatisfaction with the proposed modified schedule that the Defendants were not obligated to even offer does not suffice to demonstrate discriminatory intent.

Kontoulis also maintains that Perrymore's comments to her throughout her employment create a reasonable inference that her son's disability was a determining factor in her termination.  In support of this contention, Kontoulis argues that Perrymore's comments such as "I don't care if your son has a disability," "it's not my problem;" "maybe this job is not for you;" see Pl.'s Facts ¶¶ 7, 43, raise an inference that she was terminated due to "some unfounded fear of [Kontoulis] taking future time off to care for her son once she exercised her FMLA rights for his care on a single occasion."  Pl.'s Mem. of Law. In Resp. to Defs.' Mot. for Summ. J. (Doc.

No. 38-1) [hereinafter "Pl.'s Resp."] at 8-9.  For example, Kontoulis alleges that when she made her time off request to Perrymore, Perrymore responded by stating that "I don't care if your son has a disability.  You have to figure it out.  It's not my problem.  You need to figure it out.  You need to find other accommodations for your son and maybe this job is not for you."  Defs.' Facts ¶ 24; Pl.'s Facts ¶ 24.  She also claims that her coworker Butler told her that Enclara was "looking for a reason to terminate her" and that she had a "target on [her] back."  Pl.'s Facts ¶ 68.  If, as must be accepted for summary judgment purposes, Perrymore and Butler made such statements, which they dispute, it is not a sufficient basis on which to conclude that Defendants chose to fire Kontoulis based on "some unfounded fear of [Kontoulis] taking future time off to care for her son once she exercised her FMLA rights for his care on a single occasion."  Pl.'s Resp. at 9.

Such remarks are insufficient unless the plaintiff can establish a link between the remarks and the allegedly discriminatory conduct.  Angellini v. United States Facilities, Inc., No. 17-4133, 2018 WL 3155915, at *6 (E.D. Pa. June 27, 2018); see also Ezold v. Wolf, Block, Schoor & Solis-Cohen, 983 F.2d 509, 545 (3d Cir 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision."); Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 359 (3d Cir. 1999) ("insensitive remarks" unrelated to decision-making process are not relevant).  Perrymore's alleged statements that "I don't care if your son has a disability" and "maybe this job is not for you," allegedly made after Kontoulis requested to leave work early every day for a six-week period, were made one and a half months before Kontoulis was fired and were followed up within two days with a proposal in which Defendants attempted to create more flexibility in Kontoulis' schedule.  Defs.' Facts ¶¶ 9-10, 24; Pl.'s Facts ¶¶ 9-10,

24.  Accordingly, the alleged remarks were not "uttered when [Defendants] took disciplinary action against [her] or made the decision to terminate her employment."  Kim-Foraker v. Allstate Ins. Co., 834 F. Supp. 2d 267, 276-77 (E.D. Pa. 2011).  Here, Kontoulis has not presented evidence that Perrymore's alleged comments were ultimately linked to her termination.

Even assuming Kontoulis was able to satisfy her burden of establishing a prima facie case of discrimination, the Defendants are still entitled to summary judgment.  Defendants have articulated legitimate, nondiscriminatory reasons for her termination – the deleted email from Baach and the discovery of the unauthorized pay grade change.  See, e.g., Defs.' Mot. for Summ. J. (Doc. No. 37-1) at 17-18 [hereinafter "Defs.' Br."].  "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  An employer's "burden is one of production, not persuasion; 'it can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  Thus, Defendants have satisfied their burden and the burden shifts to Kontoulis to prove that the stated reason was pretextual.

In proving pretext, a plaintiff may survive a motion for summary judgment "by either (1) discrediting the proffered reasons, either circumstantially or directly, or (2) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  Fuentes, 32 F.3d at 764. "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

prudent, or competent." Id. at 765 (citations omitted). Rather, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the purported] non-discriminatory reasons.'" Id. (emphasis in original) (citations omitted). Moreover, liability cannot be established based upon a factfinder's "mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the [factfinder's] *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." Mitchell v. Miller, 884 F. Supp. 2d 334, 370-71 (W.D. Pa. 2012) (emphasis in original) (citing St. Mary's Honor Ctr., 509 U.S. at 519 ("It is not enough, in other words, to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis added)). Therefore, Kontoulis must present sufficient evidence to create a genuine factual dispute as to "both [whether] the employer's proffered explanation was false, and [whether] retaliation was the real reason for the adverse employment action." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997).

Kontoulis is unable to direct this Court to any evidence that discredits Defendants' proffered legitimate, nondiscriminatory reasons for her termination. According to Defendants, Kontoulis was terminated for serious acts of misconduct, which included deleting an email from General Counsel Baach and changing her pay grade in the payroll system and backdating it to three separate dates, all of which was confirmed by the IT Department. See, e.g., Defs.' Br. at 17-18. With respect to her deleting a previous email from Baach and claiming that she never received it, Kontoulis admits to the entire series of events pertaining to the deletion of the email

she received from Baach about the wage garnishment.  Pl.'s Facts ¶¶ 46-48; Defs.' Reply (Doc. No. 39) at 3.

Moreover, Kontoulis is unable to dispute the unrebutted documentation and circumstances surrounding the unauthorized pay grade change that ultimately led to her immediate termination.  While Kontoulis maintains that she did not "engage in any unauthorized system manipulation," see, e.g., Pl.'s Facts ¶ 44, she does not dispute that Defendants' IT department confirmed that her pay grade was in fact increased and backdated without authorization from her computer and under her log-in name.  Defs.' Facts ¶ 52; Pl.'s Facts ¶ 52; Defs.' Reply at 6-7.  Nor does she dispute the events of the morning of her termination.  With respect to the payroll system changes, Altomare immediately went to Perrymore upon discovery of the payroll changes for clarification of whether the pay grade changes were authorized.  Defs.' Facts ¶ 51; Pl.'s Facts ¶ 51.  After Perrymore received the audit report from Altomare, she met with General Counsel Baach.  They both agreed that Kontoulis' conduct with respect to both the deleted email and the pay grade change warranted termination.  Defs.' Facts ¶¶ 62, 64; Pl.'s Facts ¶¶ 62, 64.  Thus, upon discovery of the unauthorized pay grade change, Defendants took action immediately in terminating her that same day.  Defs.' Facts ¶¶ 53, 62, 64; Pl.'s Facts ¶¶ 53, 62, 64.  Although Kontoulis maintains that she was "unaware" how the changes were made, she does not put forward any evidence disputing the documentation revealing that the pay grade changes were made on her computer under her username.  Defs.' Facts ¶ 51; Pl.'s Facts ¶ 51.  Her claim that she was "unaware of how the changes were made," Pl.'s Facts ¶ 51, does not create material facts sufficient to defeat Defendants' Motion for Summary Judgment.

Kontoulis argues that the unauthorized pay grade change was merely pretext because making such a change in the system "does not make any sense."  See, e.g., Pl.'s Facts ¶ 44; Pl.'s

Resp. at 10-11.  Kontoulis further maintains that it "strains credulity" for Kontoulis to implement

such a change because any changes to the payroll system were required to be authorized and

approved by Altomare, the Director of Finance.  Pl.'s Resp. at 10.  Moreover, while Defendants

hypothesize that Kontoulis would attempt to change her pay grade to be eligible for more money,

see Defs.' Facts ¶ 44, Kontoulis argues that even at her current pay grade she was still eligible to

receive merit increases, making any pay grade change illogical.  Pl.'s Resp. at 11.  Regardless of

whether any attempt to manipulate the pay grade level was logical or not, Kontoulis has failed to

rebut that the pay grade changes were unauthorized, made on her computer, under her username,

and were the basis of the decision to terminate her employment immediately upon discovery.

Aside from responding to Defendants' evidence of her misconduct by "maintain[ing] . . . that she

did not engage in any unauthorized system manipulation," see, e.g., Pl.'s Facts ¶ 44, Kontoulis

has not provided any evidence "that would allow a reasonable jury either to disbelieve

[Defendants'] nondiscriminatory and non-retaliatory reasons for terminating her, or to believe

that any discriminatory or retaliatory animus would have 'had a determinative effect' on her

termination."  Oden v. SEPTA, 671 F. App'x 859, 862 (3d Cir. 2016).  None of the evidence

offered by Kontoulis casts doubt on Defendants' reasons for her termination.  "[T]o avoid

summary judgment, [Plaintiff's] evidence rebutting the [Defendants'] proffered legitimate

reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-

discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate

the employment actions."  Fuentes, 32 F.3d at 764 (emphasis in original).  Here, Kontoulis has

failed to do so.

      For the foregoing reasons, this Court concludes that Kontoulis has not put forth evidence

"demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions" in Defendants' reasons for terminating her, such that "a reasonable factfinder could rationally find them unworthy of credence and, hence, infer that the [Defendants] did not act for the asserted non-discriminatory reasons." Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 277 (3d Cir. 2010) (quoting Fuentes, 32 F.3d at 764-65); Cellucci v. RBS Citizens, N.A., 987 F. Supp. 2d 578, 592 (E.D. Pa. 2013) (granting summary judgment for claim of age discrimination when performance issues were well documented, even though plaintiff cited a "handful" of remarks made by her supervisor concerning her age and retirement plans). Accordingly, Defendants are entitled to summary judgment on Kontoulis' claim of discrimination under the ADA.

## 2.   Retaliation

Defendants are similarly entitled to summary judgment on Kontoulis' ADA retaliation claim.  The ADA protects against retaliatory action, stating that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by" the ADA.  42 U.S.C. § 12203(a).  Retaliation claims under the ADA are likewise analyzed under the burden-shifting framework of McDonnell Douglas.  Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000).

With respect to her ADA retaliation claim, Kontoulis asserts that the timing of her termination was suggestive because she was terminated shortly after taking FMLA leave and immediately after her meeting with Williams in which she raised complaints about Perrymore's treatment of her.  Pl.'s Resp. at 13-16.  It is undisputed, however, that when Baach and Perrymore met with Altomare to discuss the changes to Kontoulis' pay grade in ADP and ultimately their decision to terminate her employment, they were unaware that Kontoulis was even meeting with Williams.  Defs.' Facts ¶ 64; Pl.'s Facts ¶ 64.  Indeed, Kontoulis admits that

the decision to terminate her had "**already been made**" before Perrymore became aware of Kontoulis' meeting with Williams.  Defs.' Facts ¶ 64 (emphasis added); <u>see also</u> Pl.'s Facts ¶ 64. Consequently, Kontoulis fails to establish any type of connection between her meeting with Williams and her termination necessary to establish a claim of retaliation under the ADA.

Moreover, for the reasons discussed <u>supra</u> in Section III.A.1, Kontoulis fails to put forth evidence that the Defendants' legitimate nondiscriminatory reasons for terminating her were pretextual.  Therefore, Defendants are likewise entitled to summary judgment on Kontoulis' ADA retaliation claim.

### B.      Defendants Are Entitled to Summary Judgment on Kontoulis' FMLA Claims[2]

Finally, Kontoulis asserts that Defendants violated the FMLA by terminating her employment in retaliation for her exercise of her FMLA rights in taking leave.  Pl.'s Resp. at 18-22.  The FMLA prohibits an employer from "discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights."  29 C.F.R. § 825.220(c); <u>see also</u> 29 U.S.C. § 2615(a)(2).  As with Kontoulis' ADA claims, FMLA retaliation claims are analyzed under the burden-shifting framework established in <u>McDonnell</u>

---

[2]    While Defendants move for summary judgment on Plaintiff's entire Complaint, including her FMLA interference claim (Count III), Kontoulis' Response to Defendants' Motion for Summary Judgment expressly states that she does not oppose "'Point 3' of Defendants' motion regarding her claim for Interference under the FMLA."  Pl.'s Resp. at 3 n.1.  Accordingly, summary judgment will be granted in favor of the Defendants on Kontoulis' FMLA interference claim. <u>See, e.g.</u>, <u>Fischer v. G4S Secure Solutions USA, Inc.</u>, 614 F. App'x 87, 91 n.3 (3d Cir. 2015) (affirming district court's determination that plaintiff abandoned claim by failing to address it at all in opposition to motion for summary judgment and noting that "'[i]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered [and] [i]f it does not do so, and loses the motion, it cannot raise such reasons on appeal.'" (quoting <u>Liberles v. Cnty. of Cook</u>, 709 F.2d 1122, 1126 (7th Cir. 1983))); <u>Sylvester v. DGMB Casino, LLC</u>, No. 15-8328 (RMB/KMW), 2017 WL 3894964, at *10 (D.N.J. Sept. 6, 2017).

Douglas. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012). To make out a prima facie case of FMLA retaliation, a plaintiff must establish that: (1) he or she invoked his or her right to FMLA-qualifying leave; (2) he or she suffered an adverse employment decision; and (3) the adverse action was causally related to his or her invocation of rights. Id. If a plaintiff can make this showing, the burden of production then shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason' for its decision." Id. (quoting McDonnell Douglas, 411 U.S. at 802). If the defendant meets this "minimal burden," the plaintiff must then show that this proffered justification is mere pretext for retaliation by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [the defendant's] articulated legitimate reasons.'" Id. (quoting Fuentes, 32 F.3d at 764).

Defendants argue that Kontoulis fails to establish a causal connection between her taking FMLA leave and her termination. Defs.' Br. 24-27. To establish causation, a plaintiff "must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with the timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Krouse, 126 F.3d at 501; Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)). "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr., 503 F.3d 217, 232 (3d Cir. 2007) (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)).

Kontoulis argues that, because she was approved for FMLA leave in late June 2017, took FMLA leave on August 2, 2017, and was ultimately terminated on August 9, 2017, the timing

was "unduly suggestive" to infer causation.  Pl.'s Resp. at 20.  Moreover, Kontoulis relies on

various comments allegedly made by Perrymore that she claims "demonstrate . . . causality."  Id.

She is mistaken.  Although temporal proximity of days may be sufficient to defeat summary

judgment in certain instances, here it is not.  Even in cases where the proximity of events and/or

other evidence of retaliatory animus is sufficient to create an inference of causation, "[a] causal

link between an employee's protected activity and an adverse employment action can be broken

by an intervening event."  Checa v. Drexel Univ., No. 16-108, 2016 WL 3548517, at *6 (E.D.

Pa. June 28, 2016) (citing Weiler v. R&T Mech., Inc., 255 F. App'x 665, 669 (3d Cir. 2007)).

An act of misconduct occurring between the dates of the protected activity and adverse

employment action is the type of intervening event that can destroy what otherwise would be an

inference of retaliation.  Id.; see also Caplan v. L Brands/Victoria's Secret Stores, LLC, 210 F.

Supp. 3d 744, 760 (W.D. Pa. 2016) (10-day proximity did not create inference of retaliation

when employer received an ethics complaint regarding employee during the interim), aff'd sub

nom. Caplan v. L Brands/Victoria's Secret Stores, 704 F. App'x 152 (3d Cir. 2017).  Although

Kontoulis took one day of FMLA leave on August 2, 2017, Defendants were confronted with

two instances of misconduct after that day.  First, on August 3, 2017, Kontoulis deleted an email

she received from Baach and claimed she never received it.  Pl.'s Facts ¶¶ 46-48.  Second, on

August 9, 2017, Perrymore and Baach were alerted to Kontoulis' unauthorized pay grade change.

Defs.' Facts ¶¶ 51-53; Pl.'s Facts ¶¶ 51-53.  Although Kontoulis did take FMLA leave a week

prior to her termination, she has failed to establish any causal relationship between that leave and

her termination in light of the intervening instances of misconduct.[3]

---

[3]    Moreover, to the extent that Kontoulis argues that the timing of her termination on the same

(Footnote continued on next page)

Moreover, as with her ADA claims, even if it were to be assumed that Kontoulis had established a prima facie case of retaliation, Kontoulis cannot establish pretext. As an initial matter, Kontoulis has not made any showing that Baach, who, along with Perrymore, made the decision to terminate Kontoulis, was aware of any issues relating to her FMLA leave. Her sole argument for pretext is that she was unable to change her pay grade without approval from Altomare and that it would purportedly not even be logical to change her pay grade because she was still eligible for merit increases. Pl.'s Resp. at 21. Once again, for the reasons discussed supra in Section III.A.1, on the evidence presented here, this argument is an insufficient basis to raise a genuine factual dispute regarding whether one of Defendants' stated reasons for Kontoulis' termination—the unauthorized pay grade change—was pretextual. As explained supra, Altomare immediately went to Perrymore upon discovery of the payroll changes to Kontoulis' pay grade. Defs.' Facts ¶ 51; Pl.'s Facts ¶ 51. After Perrymore received the audit report from Altomare, she met with Baach. They both agreed that Kontoulis' conduct on both the deleted email and the pay grade change warranted termination. Upon discovery of the unauthorized pay grade change, Defendants took action immediately in terminating her that same day. Defs.' Facts ¶¶ 53, 62, 64; Pl.'s Facts ¶¶ 53, 62, 64. Regardless of whether any attempt to increase the pay grade level was logical or not, the record is devoid of any evidence disputing that the pay grade changes for Kontoulis were unauthorized, made on her computer, under her username, and were the basis of the decision to terminate her employment immediately upon discovery. Because the ultimate question is whether discriminatory animus determined the

---

day she met with Williams establishes, or at least raises an inference, of causation, Kontoulis admits that Defendants were unaware of her meeting with Williams when they made the decision to terminate her. Defs.' Facts ¶ 64; Pl.'s Facts ¶ 64.

employer's action, an employee cannot discredit the employer's proffered reason simply by showing that the employer's decision was "wrong or mistaken."  <u>Fuentes</u>, 32 F.3d at 764.  Kontoulis' conjecture as to why it would not make sense for her to change her pay grade is not a sufficient basis on which a jury reasonably could infer that the real reason for terminating Kontoulis' employment was in retaliation for Kontoulis' use of FMLA leave.  Kontoulis' FMLA retaliation claim, therefore, must be dismissed.

## IV.    **CONCLUSION**

For the reasons discussed above, Defendants will be granted summary judgment as to all of Plaintiff's claims in this action.  An appropriate order follows.

Dated: October 28, 2020

BY THE COURT:


*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE